O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 8th WONDER ENTERTAINMENT, LLC, et al., | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:14-cv-01748-DDP-JCG **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** [Dkt. 45] |
| Plaintiff, | | |
| v. | | |
| VIACOM INTERNATIONAL, INC., et al., | | |
| Defendants. | | |

Presently before the court is Defendants Viacom International Inc., MTV Networks Enterprises, Inc., New Pop Culture Productions, Inc., Monami Entertainment, LLC, Mona Scott-Young, NFGTV, Inc., Jim Ackerman, Jeff Olde, Toby Barraud, Stefan Springman, and Christian McLaughlin's (collectively, "Defendants") Motion for Summary Judgment on Plaintiffs 8th Wonder Entertainment, LLC ("8th Wonder"), Nickie Lum-Davis and Trisha Lum's (collectively, "Plaintiffs") action for copyright infringement. (Dkt. 45.) After considering the parties' submissions and hearing oral argument, the court adopts the following Order.

## I. BACKGROUND

### A. The Parties

In December 2008 or January 2009, Trisha Lum and Tashera Simmons conceived of an idea for a television show featuring the lives of women in relationships with hip hop artists. (Lum Decl. ¶¶ 2-4.) Lum then reached out to Nickie Davis to develop a Treatment for the concept. (*Id.* ¶ 7.) The Treatment, which was finalized on February 27, 2009, described an idea for a reality television show entitled "Hip Hop Wives," (HHW). (*Id.* ¶ 8.) The show would feature Simmons, along with three other women connected to the hip hop industry: Chrissy Lampkin, Mashonda Tifrere, and Debbie Lorenzo. (*Id.* ¶ 10-11.) All four principal cast members signed talent attachment letters at the same time, memorializing their commitment to the HHW project. (*Id.* ¶ 12.)

During the development of HHW, Davis reached out to 8th Wonder Entertainment about the possibility of pitching the idea to network and producing the show. (*Id.* ¶ 14.) On February 27, 2009, Plaintiffs 8th Wonder, Lum, and Davis met with executives at VH1, a television network owned by Defendant Viacom International, to pitch the HHW project. (*Id.* ¶ 16.) On March 17, 2009, Defendant Viacom submitted an offer to 8th Wonder to develop and potentially broadcast HHW. (*Id.* ¶ 17.) By April 24, 2009, Plaintiffs developed a written agreement with Defendants regarding HHW. (Decl. Michael McQuarn ¶ 16, Ex. A.) Plaintiffs subsequently assisted Defendants in executing Artist Performer Agreements with the four principal cast members. (*Id.* ¶ 19.)

On October 29, 2009, Plaintiffs were informed by counsel for one of the contemplated cast members, Chrissy Lampkin, that she was no longer interested in working on the project and wanted to terminate the agreement. (Lum Decl. ¶ 23.) In December 2009, Plaintiffs were notified by VH1 that the network would not be moving forward with HHW. (*Id.* ¶ 25.) On February 8, 2010, 8th Wonder executed a termination agreement with VH1. (Decl. Susannah M. Rooney, Ex. A.) On March 14, 2011, VH1 aired the premiere of "Love & Hip Hop" (L&HH), a reality television show focused on the personal and professional lives of women in the hip hop industry. (First Amended

2

Complaint ¶ 79.) In 2014, after L&HH had been on the air for four seasons, Plaintiffs filed suit for copyright infringement. (*See* FAC.)

### B. "Hip Hop Wives" Treatment

The basis of Plaintiffs' copyright infringement action is the one-page Treatment that Plaintiffs produced and submitted to VH1 when they were pitching HHW. (FAC, Ex. A.("Treatment"). ) The Treatment opens by stating that the show's concept is to "delve deep into the lives of four women married to some of the biggest names in hip hop. . . . This show will reveal the ups and the downs that come with being the wife of a hip hop icon." (*Id.* ¶ 1.) The Treatment then introduces the four principal cast members. The following descriptions are all taken for the treatment. First is Tashera Simmons, the wife of hip hop artist DMX. (*Id.* ¶ 2.) Simmons met DMX when they were 10 and have been in a relationship for over 20 years. (*Id.*) DMX has had legal troubles and public infidelities but "his latest bout in jail is testing her resolve like never before." (*Id.*) The next cast member is Debbie Lorenzo, the wife of producer Irv Gotti. (*Id.* ¶ 3.) Lorenzo and Gotti have lived apart for five years. (*Id.*) During this time, Lorenzo has raised their children and returned to school to pursue a higher degree. (*Id.*) The third cast member is Mashonda Tifrere. (*Id.* ¶ 4.) Tifrere was the wife of producer Swizz Beats. (*Id.*) The two were married for four years but then went through an acrimonious divorce. (*Id.*) Tifrere is now trying to make her own mark as a singer, entrepreneur, and philanthropist. (*Id.*) The final cast member is Chrissy Lampkin. (*Id.* ¶ 5.) Lampkin is in a relationship with hip hop artist Jim Jones. (*Id.*) She is also a celebrity style who "was publicly pursued by a number of A-list men in the music industry, but she chose Jim—the "love of her life." (*Id.*)

After describing the cast members, the Treatment notes that the series will show "each of these women in their daily lives, individually and as real-life friend, as they share in the spoils and struggle with the challenges being a hip hop wife entails." (*Id.* ¶ 6.) Viewers will "[g]et the real story," "[l]earn the truth behind the legal troubles, rumors and scandals" surrounding the featured artists, and "see how it has affected the women

who stand beside [those artists]." (*Id.*) The Treatment closes by inviting viewers to "[w]atch as the drama unfolds in the no-holds barred, in-depth, insider look at the woman these hip hop icons chose to 'wife.'" (*Id.* ¶ 7.)

### C. Love & Hip Hop Television Series

L&HH is reality television series that premiered on VH1 in 2011. The show depicts the lives of women involved with the hip hop and R&B music industry. (Rooney Decl., Ex. A.) There have been six seasons to date, consisting of 82 episodes. (Rooney Decl., Ex. I.) During its run, the series has featured nearly two dozen women as principal cast members, but each season typically focuses on four to six women. (*Id.*) As the parties primarily focus their arguments on the first season of the show, the court limits its recitation of the facts to the storylines from the first eight episodes. (Rooney Decl., Ex. A.)

The first season of L&HH features four principal cast members: Chrissy Lampkin, who was also featured in the HHW Treatment, Somaya Reece, Olivia Longott, and Emily Bustamante. As a reality television show, the series purports to depict the real-life happenings of the principal cast members and those around them. The typical episode of L&HH is comprised of individual scenes developing the story lines of the four leading women interspersed with group scenes where two or more of the cast members gather to recount various happenings and develop their own interpersonal dynamics.

One story line from the first season focuses on Chrissy Lampkin's efforts to settle down with Jim Jones. Although they have been dating for years, she struggles with Jones's failure to commit and the fact that his affection is divided between his mother and Lampkin. By the end of the season, Lampkin has decided to propose to Jones and makes a speech at a nightclub. Jones agrees and, despite his mother's disapproval, buys Lampkin an engagement ring.

Lampkin also has tension with another principal character, Somaya Reece. Reece's storyline focuses on her life as an aspiring hip hop artist who has recently moved to New York in an effort to build her music career. Reece is introduced to Jones early in the seasons and strives to win his support as a producer. Lampkin, however, perceives Reece

as flirting with Jones and discourages Jones from working with Reece. In an effort to demonstrate his commitment to Lampkin, Jones complies and declines to support Reece. Reece eventually secures a new manager but Jones intervenes in that situation as well and discourages the new manager from working with Reece.

A third story line follows Olivia Longott. Longott was previously a member of the hip hop group G-Unit. The show features Longott's efforts to develop her solo career. During the first season, Longott also claims to be dating a member of the New York Jets in an effort to maintain standing among her friends. However, fellow cast member Emily Bustamante is the Jets' player's personal stylist. After finding out from the player that he has not been romantically involved with Longott for at least a year, Bustamante confronts Longott about the lie. As a result, tension develops between these two characters. There is also friction between Longott and Reece who insults Longott's musical abilities online.

The final major storyline focuses on Emily Bustamante, the long-time girlfriend and stylist of Fabolous. As the season develops, it emerges that although Bustamante lives with Fabolous and has a child with him, Fabolous does not publicly acknowledge his relationship with Bustamante. Bustamante's friends, including Mashonda Tifrere, who was also slated to feature in HHW, encourage Bustamante to leave Fabolous. The climax of this story line occurs when Bustamante sets up a family photo shoot but Fabolous fails to appear. Bustamante ultimately decides to leave Fabolous, move into her own apartment, and start a new life.

**II. LEGAL STANDARD**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All

1 reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id*.

**III. DISCUSSION**

To state a claim for copyright infringement, a Plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). The parties do not dispute that Plaintiffs own a copyright to the Treatment. (Lum Decl. ¶ 14.) To demonstrate copying, a plaintiff must show that "the infringer had access to plaintiff's

6

1 copyrighted work and that the works at issue are substantially similar in their protected
2 elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). "Where
3 reasonable minds could differ on the issue of substantial similarity, . . . summary
4 judgment is improper." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990). However,
5 the Ninth Circuit has rejected efforts to characterize *Shaw* as "either prohibit[ing]
6 summary judgment in copyright cases or creat[ing] a heightened standard." *Kouf v Walt
7 Disney Pictures*, 16 F.3d 1042, 1045 n.3 (9th Cir. 1994); *see also Berkic v. Crichton*, 761 F.2d
8 1289, 1292 (9th Cir. 1985) ("[W]e have frequently affirmed summary judgments in favor
9 of copyright defendants on the substantial similarity issue.") (collecting cases).

### A. Access to the Treatment

For purposes of the present motion, Defendants concede the allegations of access to the Treatment. (Mot. 11-12.) Plaintiffs nonetheless press the issue to suggest that the evidence of access gives rise to an inference of copying. (Opp'n 9.) Specifically, Plaintiffs note that one of the creators of L&HH admitted to one of the creators of the Treatment that she thought HHW "was such a great idea" and "that she had wished she had come up with it." (Lum Decl. ¶ 20.) In Plaintiffs' view, this statement is tantamount to an admission of copying. However, even if there is evidence of access, Plaintiffs cannot state a claim for copyright infringement without showing substantial similarity. *See, e.g., Krofft Tele. Prods. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977) ("No amount of proof of access will suffice to show copying if there are no similarities."), *superseded on other ground by* 17 U.S.C. § 504(b); *Funky Films*, 462 F.3d at 1082 (quoting same). The same is true even if a defendant admits to using another's work. *See BensBargains.net, LLC v. XPBargains.com*, 2007 WL 2385092, at *3 (S.D. Cal. 2007) (holding that "Plaintiff must prove the existence of a triable issue of material fact with respect to substantial similarity, regardless of how strong its evidence is that Defendants in fact copied . . . ."); *see also Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) ("A finding that a defendant copied a plaintiff's work, without application of a substantial similarity analysis, has been made

1 only when the defendant has engaged in a virtual duplication of a plaintiff's entire
2 work.").

3 Plaintiffs also press the issue of access to invoke the "inverse ratio rule," which
4 provides that a high "degree of access justifies a lower standard of proof to show
5 substantial similarity." *Krofft*, 562 F.2d at 1172. While the *Krofft* panel noted that "it [was]
6 impossible to quantify this standard" in that case, subsequent decisions have reaffirmed
7 that "[e]ven where the fact of copying is conceded, no legal consequences will follow
8 from that fact unless the copying is substantial." *Newton v. Diamond*, 388 F.3d 1189, 1192-
9 93 (9th Cir. 2003). Thus, although the court is mindful that the degree of access in this
10 case might justify a lower standard of proof, the court proceeds to consider whether the
11 alleged copying, if any, was substantial.

**B. Substantial Similarity of Protected Elements**

To determine substantial similarity, a plaintiff must satisfy both an "extrinsic test"
and "intrinsic test." *Funky Films*, 462 F.3d at 1077. Prior to a jury trial, courts only
evaluate the extrinsic test because "the intrinsic test, which examines an ordinary
person's subjective impressions of the similarities between two works, is exclusively the
province of the jury." *Id.* However, a "plaintiff who cannot satisfy the extrinsic test
necessarily loses on summary judgment, because a jury may not find substantial
similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at
1045). The extrinsic test is an objective comparison of specific, protectable expressive
elements. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822-23 (9th Cir. 2002); *see also Funky
Films*, 462 F.3d at 1077 ("In applying the extrinsic test, this court compares, not the basic
plot ideas for stories, but the actual concrete elements that make up the total sequence of
events and the relationships between the major characters.")

1. General Elements Are Not Protectable

In determining the scope of copyright protection afforded the Treatment, the court
begins by noting that copyright protection does not protect ideas generally but instead
the expression of those ideas. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174–75 (9th Cir. 2003).

8

As the Ninth Circuit has explained, "similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). Thus, when applying the extrinsic test, the court "must take care to inquire only whether the protectable elements, standing alone, are substantially similar." *Funky Films*, 462 F.3d at 1077. This requires "filter[ing] out and disregard[ing] the non-protectable elements in making [the] substantial similarity determination." *Cavalier*, 297 F.3d at 822. In addition to general plot ideas, the court must also disregard scènes à faire, "which are scenes that flow naturally from unprotectable basic plot premises and 'remain forever the common property of artistic mankind.'" *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1294 (C.D. Cal. 2008) (quoting *Berkic*, 761 F.2d at 1293). Finally, facts within a work are not protected by copyright. *Feist*, 499 U.S. at 349 ("No matter how original the format . . . facts themselves do not become original through association.").[1]

The idea for HHW expressed in the Treatment is largely comprised of unprotectable elements. By way of background, many of the concepts described in the treatment are general tropes from the saturated market of reality television programming. First, when Plaintiffs produced the Treatment, there were already several television shows that depicted the lives of women connected with either wealthy or famous individuals. Starting with the *Real Housewives of Orange County* in 2006 and continuing with spin-offs based in New York (2008), Atlanta (2008), and New Jersey (2009), a number of series utilized the structures and narrative devices described in the Treatment of depicting a small cast of women in relationships with prominent men as they endure the highs and lows of their relationships, friends, and lives generally. (*See* Rooney Decl., Ex. I (Margolin Report) ¶¶ 19-20.)

---

[1] Although Plaintiffs suggest that this rule only extends to "'historical or contemporary facts that are known to the public,'"(Opp'n at 14 (quoting *Hoehling v. Universal City Studios*, 618 F.2d 972, 974 (2d Cir. 1980)),) this argument is neither supported by the Second Circuit case relied upon by Plaintiffs nor the law of this Circuit. *See Shaw*, 919 F.2d at 1356 ("[F]acts and ideas within a work are not protected.").

9

Admittedly, the Real Housewives series expressly focuses on women bound by a specific geography while HHW intends to focus on women bound by a specific industry. But the prior art also contains numerous examples of shows focused on the lives of hip hop stars and their families. Shows such as *Run's House* (2005), *The Salt-N-Pepa Show* (2007), *Snoop Dogg's Father Hood* (2007) and *Gotti's Way* (2007) all depict the lives of famous hip hop and R&B artists and their interactions with their families. (*Id.* ¶ 23.) Given this context, no rational jury could agree with Plaintiffs' assertion that combining these two generic concepts in a one-page Treatment resulted in a "highly original" work. In fact, programs from the *E! True Hollywood Story* series addressed nearly identical concepts in episodes entitled *Hip Hop Wives* (2006) and *Rapper Wives* (2008). (*Id.* ¶ 26.) Moreover, these shows depict many of the themes referenced in the Treatment, including struggling with legal trouble, infidelity, deteriorating relationships, struggles with child-rearing, inter-family conflict, and women seeking to achieve success independent of their prominent partners. (*See id.* ¶¶ 19-26.)

In addition to the general scènes à faire utilized in reality television shows focusing either on groups of wives or the lives of artists in the hip hop industry, the factual biographies of the cast members selected for the Treatment are not entitled to copyright protection. As one of creators of the Treatment concedes, the facts included in the Treatment "are all real life facts about these women" and that "this is what they were actually going through." (Rooney Decl., Ex. E (Lum Depo.) 72:11-22.) In a separate deposition, the owner of 8th Wonder suggested that there were at least two fictional elements in the treatment: 1) the women did not all "stand by their man" contrary to a phrase in the Treatment suggesting that they did and 2) one of the character is not actually a stylist. (*Compare, e.g.,* Rooney Decl., Ex. G (McQuarn Depo.) 87:25-88:14 ("[Tashera's] not by his side) *with* Treatment ¶ 7 ("see how it has affected the women who stand beside them") *and* McQuarn Depo. 110:10-25 ("Chrissy is not a celebrity stylist.") *with* Treatment ¶ 6 ("Meet Chrissy . . . a celebrity stylist . . . .").) Even crediting

10

these touches of imagination, the remainder of the biographies of the four women featured in the treatment are not subject to any copyright protection.

After disregarding the unprotectable elements of Treatment—including, the general idea of a reality television show about women in relationships with famous individuals; a reality television show about the families of hip hop artists; the factual biographies of Tashera Simmons, Chrissy Lampkin, Mashonda Tifrere, and Debbie Lorenzo; general themes of relationship difficulties, legal challenges, troubled family dynamics, female friendships, and the burdens of the lifestyles of the rich and the famous—the court is able to identify few, if any, protectable elements that would give rise to a claim for copyright infringement of the Treatment. While this disposes of Plaintiffs' claim, the court nonetheless proceeds to consider whether there is a substantial similarity between the Treatment for HHW and L&HH, assuming *arguendo* the existence of protectable elements.

2. Similarity of Protectable Elements

To apply the extrinsic test for substantial similarity, a court must determine whether there are "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works at issue. *Funky Films*, 462 F.3d at 1077.

a. Plot and Sequence of Events

The plot is "the sequence of events by which the author-expresses his theme or idea." *Zella*, 529 F. Supp. 2d at 1135. As noted above, the court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293. By that definition, the Treatment is largely devoid of any plot. In its fullest form, the plot of Treatment is a general ambition to follow "these women in their daily lives, individually and as real-life friends, as they share in the spoils and struggle with the challenges being a hip hop wife entails." (Treatment ¶ 6.) These generalized points do not lay out any sense of narrative arc or character development nor do they specify any particular

11

1  expression of the general concept of the show. By contrast, L&HH develops a number of
2  parallel and intersecting plots across it episodes, which consist of a "total sequence of
3  events and relationships." One illustrative example is the plot for the relationship
4  between Bustamante and Longott in the first season. Early in the season, a group of
5  women gather to relax poolside and update each other on their lives. In an effort to
6  maintain stature in the eyes of her friends, Longott claims to be dating Darrelle Revis, a
7  player for the New York Jets. Bustamante, a relative newcomer to the group, happens to
8  be the personal stylist for Revis. Several episodes later, while Bustamante is meeting with
9  Revis for a style session at his apartment, she questions him about his relationship with
10 Longott. Revis informs Bustamante that the two have not been involved for at least a
11 year. Bustamante struggles with whether to confront Longott with this discovery.
12 Ultimately, Bustamante decides to confront Longott and inform her fellow cast mates
13 about the misrepresentation, which leads to tension between the two women. This
14 narrative arc is specific and plays out over a period of time. The Treatment, by contrast,
15 contains no such plot development. Plaintiffs only response is that a plot might flow
16 from the basic points laid out on the treatment but that is inadequate for purposes of
17 establishing substantial similarity. *See DuckHole Inc. v. NBC Universal Media LLC*, No. CV
18 12-10077 BRO (CWx), 2013 WL 5797279, at *7 (C.D. Cal. Sept. 6, 2013) ("The
19 commonalities between the situations and incidents in the two works 'flow naturally
20 from [the] basic plot premise' of [the] television show . . . .") (citing *Berkic* 761 F.2d at
21 1293).

b. Themes and Mood

23 Plaintiffs suggest a number of themes that overlap between HHW and L&HH
24 including "knowing when to let love go," "a man does not always have to take the lead
25 in a relationship," "finding your own independent voice," and "friendship amongst a
26 group of women." (Opp'n 19-20.) Defendants respond that their work does not contain a
27 single theme but instead several countervailing themes such romance and
28 empowerment. (Mot. 21) Defendants also contend that the purported themes in HHW

are comparatively "heavy," while L&HH contains lighter themes that focus as much on the characters' successes as their foibles. Ultimately, it is difficult to determine if there is any similarity because, aside from general statements, the Treatment contains little exposition of any "theme." One can imagine a serious show that depicts the struggles these women face as they navigate their roles in the hip hop industry and highlights the strength they find in each other just as easily as one can imagine a less didactic or uplifting show focused on petty individuals responding in overly dramatic ways to minor issues. While Plaintiffs now attempt to draw on various phrases from the Treatment to assert a certain thematic ambition, there is little in the Treatment that requires any particular thematic approach.

As with the theme, the parties present differing interpretations of mood. In Defendants' view, the mood of HHW, insofar as there is one, is "heavy" and "deep." By contrast, Defendants describe the mood of L&HH as "light-hearted." The reality is that the Treatment contains no discernible mood. It is a composition of biographical facts and general accounts of a concept. If the Treatment were ever produced, it could just as easily have a "light" mood as a "dark" one. Absent any specific indicia of mood, this factor cannot support a finding of substantial similarity.

c. Dialogue and Setting

Plaintiffs concede that the Treatment contains no dialogue. (Lum Depo. 129:8-10.) While Plaintiffs contend that this element is irrelevant in context of a reality television show, both parties agree that, at a minimum, it does not provide a basis for proving substantial similarity in this case. Likewise, Plaintiffs concede that "in this instant matter setting is not a protectable element and constitutes scènes-à-faire." Opp. at 22:2-3.

d. Pace

Relying on an expert report, Plaintiffs contend that the pace in both HHW and L&HH can be described as "fast" and "high octane." Plaintiffs' expert arrives at this conclusion on the grounds that the Treatment uses phrases like "no holds barred," "drama unfolds," and "ups and downs." The expert fails to adequately substantiate why

those words necessitate a particularly fast pace. As Defendants accurately note, the same exegesis of these women's lives could take pace at a "deliberate pace." Much like theme and mood, the Treatment lacks any specific indicator of pace that could form the basis of a claim of substantial similarity.

### e. Characters

Plaintiffs present two claims in support of their claim that the characters are substantially similar between HHW and L&HH. First, Plaintiffs note that the shows share at least two cast members in common. While Defendants acknowledge the overlap, they note that this fact is of limited value given that L&HH has featured nearly two dozen principal cast members across six seasons. Defendants also note that only one of the overlapping characters has a leading role in L&HH. The overlap of these two individuals between the shows, alone, is inadequate to create a triable issue of fact on the question of substantial similarity. Moreover, as noted above, the actual biographies of the two overlapping individuals are not subject to copyright and cannot give rise to an infringement claim.

Plaintiffs' alternative position is that even if the characters are based on the lives of real people, once those lives are developed into characters for purposes of television they can be considered copyrightable elements. (Opp'n 12.) Plaintiffs further argue that once these characters are conceived of as stock elements, even if there are few one-to-one overlaps, a number of the characteristics of the HHW cast members can be found in the L&HH cast members. Plaintiffs provide no authority, nor can the court identify any, for the proposition that the development of real life characters in a television show renders the facts of their biography copyrightable. Perhaps, if the individuals were taken as the starting point for creative works, there might be a colorable argument on this point but there is no evidence to suggest the Treatment did any work to develop the biographies of the principal cast members into "characters." Rather, the Treatment recounted basic facts about the four principal characters in a straightforward manner and declared the intention to follow where their lives go. As to the claim that characters in L&HH are

1  composites of the slated cast members for HHW, only one district court has permitted a
2  claim for copyright infringement to proceed on this character "mix-and-match" theory.
3  *See Universal City Studiosv. Film Ventures Int'l*, 543 F. Supp. 1134, 1137 (C.D. Cal. 1982).
4  Even if the court were to permit such a theory, there is inadequate evidence to support
5  the conclusion the chance overlap in characteristics between the individuals in the
6  Treatment and those in L&HH amounts to a showing of substantial similarity. Many of
7  the identified characters are stock attributes that flow from the basic premise of the show.
8  Moreover, giving undue weight to this minimal overlap runs afoul of the Ninth Circuit's
9  warning against finding "substantial similarity" where a Plaintiff only "emphasizes
10 random similarities scattered throughout the works." *Litchfield v. Spielberg*, 736 F.2d 1352,
11 1356–1357.

12     Given that each factor strongly counsels against a finding of substantial similarity,
13 the court concludes that, even if Plaintiffs' Treatment contained any protectable elements,
14 no reasonable jury could conclude that the two works are substantially similar.

15         3.  *Metcalf* Claim

16     Plaintiffs' final argument against summary judgment is that, even if the Treatment
17 is largely comprised of generic and unprotectable elements, the "'particular sequence in
18 which an author strings a significant number of unprotectable elements can itself be a
19 protectable element.'" (Opp'n 22 (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir.
20 2002)).) Although Plaintiffs recognize that *Metcalf* is "a narrow decision [that] the courts
21 have been reluctant to expand," Plaintiffs contend that the reluctance to extend *Metcalf* is
22 because the other cases involved less clear proof of access to the copyrighted work.
23 (Opp'n 22.) Reprising their arguments about the "inverse ratio rule," Plaintiffs contend
24 that where access is largely undisputed, as here, the court should more readily consider a
25 *Metcalf* claim. *See Rice*, 330 F.3d at 1179 ("[O]ur decision in Metcalf was based on a form
26 of inverse ratio rule analysis: the plaintiff's case was strengthened considerably by
27 [defendants'] concession of access to their works.) (quotations and citations omitted).
28 With the frame in mind, Plaintiffs contend that there is a triable *Metcalf* claim, as the two

works focus on similar story lines, share at least two characters in common, depict life in the same cities, and focus on women who are approximately at the same level of prominence in the world of hip hop. (Opp'n 23.)

     Plaintiffs are correct that Ninth Circuit concluded in *Metcalf* that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." *Metcalf*, 294 F.3d at 1074 ("Each note on a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection.") This holding was based on the "striking" similarities between the plaintiffs' and defendants' works, including the fact that the works in *Metcalf* featured the same hospital setting in the same city; had a similar cast of supporting characters; addressed the same issues; starred similar looking characters with nearly identical backgrounds who confronted similar dilemmas and obstacles; and had nearly identical plot sequences. *Id*. at 1073–74. Based on this overlap, the court concluded that a jury "could easily infer that the many similarities between plaintiffs' scripts and defendants' work were the result of copying, not mere coincidence." *Id*. at 1075.

     Courts since *Metcalf* have been reluctant to extend such a claim to situations where the overlap between the nonprotectable elements were not quite as significant. *See Bernal*, 788 F. Supp. 2d at 1068 (holding that *Metcalf* applies where "generic similarities [are] voluminous, nearly identical, and occurred in the same pattern"); *Zella*, 529 F. Supp. 2d at 1138 (noting that many courts "have been reluctant to expand this concept beyond the clear-cut case in Metcalf") (collecting cases); *see also Identity Arts v. Best Buy Enter. Servs. Inc*, 2007 WL 1149155, at *17 (N.D. Cal. Apr. 18, 2007) (finding that "in Metcalf, the 'many' generic similarities and patterns present in the works in question were much more voluminous and specific than in this case."). While some post-*Metcaf* decisions have noted that the absence of evidence regarding access provided another reason to deny such a claim, none of these cases displaced the high burden for showing similarity in order to state a *Metcalf* claim. Indeed, several cases dismissing *Metcalf* claims involved situations where access was either stipulated to or admitted. *See, e.g.*, Zella, 529 F. Supp.

2d at 1138; *Bethea*, 2005 WL 1720631, at *15. Given this standard, the court cannot conclude that there is any triable copyright claim. First, the substantial similarity analysis, *supra*, confirms that even any overlap or sequencing is largely superficial and that there are significant differences between the work. Moreover, even though Plaintiffs have identified a few random similarities scattered throughout the work, they are inadequately to show that the creators of L&HH have strung together a substantial number of unprotectable elements. *See Flynn v. Surnow*, 70 U.S.P.Q. 2d 1231, 1238 (C.D.Cal.2003) (rejecting a *Metcalf* claim because the alleged similarities were "randomly scattered throughout the works and have no concrete pattern or sequence in common.")

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Motion for Summary Judgment and DISMISSES the case.

**IT IS SO ORDERED.**

Dated: November 21, 2016

```
                                    _____
                                         DEAN D. PREGERSON
                                    UNITED STATES DISTRICT JUDGE
```